IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| RIGHT AT HOME, LLC, a Delaware limited liability company; <br><br> Plaintiff, <br><br> vs. <br><br> NEAL GAUDET, an individual; ALYSSA GAUDET, an individual; and GAUDET & COMPANY INC., an Alabama corporation; <br><br> Defendants. | 8:20CV462 <br><br> MEMORANDUM AND ORDER |

This matter is before the Court on plaintiff Right at Home, LLC's ("Right at Home") motion for a preliminary injunction, Filing No. 19. This is an action for declaratory, equitable, and injunctive relief for alleged breaches of franchise agreements. The Court held hearings on the motion on December 15, 2020, and December 21, 2020. This is an action for breach of contract and declaratory relief. Jurisdiction is based on diversity of citizenship under 28 U.S.C. § 1332.

I. BACKGROUND

The record shows that plaintiff Right at Home, LLC ("Right at Home") franchises a business format system for providing in-home care for elderly or infirm individuals under its name and trademarks. Neal Gaudet, Alyssa Gaudet, and Gaudet & Company Inc. (hereinafter, "the defendants" or "the Gaudets") entered into Franchise Agreements to operate Right at Home franchises in two Alabama franchise territories.

On September 17, 2015, defendants Neal and Alyssa Gaudet signed a Franchise Agreement for the area around Mobile County, Alabama. Filing No. 12, Ex. A, 2015 Franchise Agreement. Neal and Alyssa Gaudet paid a franchise fee of $ 47,500 in 2015.

1

*Id.* at 4, attached Ex. A. In 2016, Neal and Alyssa Gaudet assigned the 2015 Franchise Agreement to defendant Gaudet & Co., LLC. Filing No. 13, Ex. B, Assignment at 3-4. Right at Home consented to the assignment and Neal and Alyssa personally guaranteed the obligations in order to obtain that consent. *Id.* at 4-7. On June 11, 2018, Gaudet & Co., LLC entered into an agreement with Right at Home for a franchise covering the area around Baldwin County, Alabama. Filing No. 14, Ex. C, 2018 Franchise Agreement. The franchise fee for that territory was $50,000. Filing No. 46, Transcript of Hearing on December 21, 2020, ("Tr. II") at 46. Defendant Neal Gaudet has a master's degree in healthcare administration and has worked in hospitals and clinics. *Id.* at 35, 88-89. The Gaudets first operated the Right at Home franchise from a rented office located on the campus of the Brookstone senior living facility, and later from an office in Baldwin county. Filing No. 46, Tr. II at 10-11, 46, 84.

In a Franchisee Disclosure Questionnaire attached to the 2015 franchise Agreement, Neal and Alyssa Gaudet both represented that they understood the information in the Franchise Agreement and had discussed the benefits and risks of operating a franchise with an attorney. Filing No. 12, Ex. A at 3, 6. Gaudet & Co. made the same representation with respect to the 2018 Franchise Agreement. Filing No. 14, Ex. C at 3.

Under the Franchise Agreements, as franchisor, Right at Home was obligated to provide franchisees with training, confidential manuals, use of its trademarks, operational tools, software, advertising, and marketing support. *See, e.g.,* Filing No. 12, Ex. A, 2015 Franchise Agreement at 9-18, 27-28. The franchisees agreed to pay Right at Home a royalty fee equal to five percent (5%) of the Net Billings derived from the Franchised

2

Business. *See id.* at 18. Both Franchise Agreements included Confidentiality and Non-Compete Agreements. Filing No. 12, Ex. A, 2015 Franchise Agreement, Ex. C-1 (attached thereto); Filing No. 14, Ex. C, 2015 Franchise Agreement, Ex. C (attached thereto). Under each of the Confidentiality and Non-Compete Agreements, the defendants agreed, after the first to occur of the termination, expiration, or transfer of the Franchise Agreement, not to become an employee of any business that engaged in the services and business of Right at Home for a period of one and a half years within a radius of ten miles from the outer boundaries of the defendant's designated territory, regardless of the cause of the termination. *See e.g.*, Filing No. 12, Ex. A, 2015 Franchise Agreement, Ex. C-1 at 2; Filing No. 14, Ex. C, Franchise Agreement, Ex. C at 2. The defendants also agreed not to directly or solicit or attempt to solicit any of Right at Home's then current or past customers, accounts, clients, or referral services for the purpose of inducing them to become customers, clients, accounts, or referral services of any competitor of Right at Home for the same period of time. *Id.* at 3. Defendant Gaudet & Co., LLC executed a separate noncompetition agreement with similar terms on September 16, 2016. Filing No. 13, Ex. B at 8-11.

Under Section 14 of both agreements, the franchisor is required to procure insurance protecting the franchisor and franchisee. Filing No. 12, Ex. A, 2015 Franchise Agreement at 27; Filing No. 14, Ex. C, 2018 Franchise Agreement at 29. Section 16.2 of each agreement sets forth actions that constitute default by the franchisee with no right to cure and give the franchisor the right and good cause to terminate the agreement effective immediately on written notice of the termination and the causes therefor. Filing No. 12, Ex. A, 2015 Franchise Agreement at 30-32; Filing No. 14, Ex. C, 2018 Franchise

Agreement at 32-33. The listed actions include understatement of royalty fees and refusal to pay an amount due for royalty fees within five days of a demand. Filing No. 14, Ex. A at 31, §§ 16.2.6; 16.4; Filing No. 14, Ex. A at 33 §§ 16.2.6, 16.4. The defendants also agreed to comply with certain post-termination obligations and to cease operation of their Right at Home home-care business on termination or expiration of the Franchise Agreements. Filing No. 12, Ex. A, 2015 Franchise Agreement at 33-36; Filing No. 14, Ex. C, 2018 Franchise Agreement at 35-38.

Also, the Franchise Agreements provide that the contracts are governed by the law of the state of Nebraska and the parties agreed to Nebraska as the choice of forum. *See, e.g.*, Filing No. 12, Ex. A, 2015 Franchise Agreement at 49, § 28.1. The parties also agreed to settle disputes by binding arbitration, except for actions for equitable relief. *Id.* at 50-51, §§ 29.2, 29.3.1

Testimony adduced at the hearing shows that Right at Home provides a standardized two-week training course to its franchisees prior to the franchisees opening their businesses. Filing No. 39, Transcript of Hearing on December 15, 2019 ("Tr. I"), at 40; Filing No. 46, Transcript of Hearing on December 21, 2019 ("Tr. II") at 39. The first week covers "office" matters (i.e., how to operate the required software, what third party websites to visit to find prospective employees, etc.), and the second week covers "marketing" (i.e., rehearsing pitches and practicing sales calls). Filing No. 46, Tr. II at 39-41). Right at Home trains its franchisees to make numerous sales calls and provides practiced pitches to present to prospective referral sources and clients. *Id.* at 40-41. Right at Home also prepares marketing materials for franchisees to use during their sales pitches and requires franchisee to purchase those materials. Filing No. 39, Tr. I at 106.

Right at Home's Chief financial officer, Margret Haynes, testified that Right at Home's brand, trademark, goodwill, trade secrets, confidential information, training, policies, procedures, and franchise system, are all part its "secret sauce" for successful operation of a home-care service. *Id.* at 41-44. Right at Home does not provide any training directly to a franchisee's caregivers or other employees. Filing No. 39, Tr. I at 108-09; Filing No. 46, Tr. II at 41:9-13.

The present dispute arises out of alleged breaches of the Franchise Agreements and the defendants' conduct in the care of former client Emmett Sellers who died on August 27, 2018 at the age of 86. Filing No. 35-1, Declaration of Margaret Haynes ("Haynes Decl.") at 14-15. Filing No. 35-1, Declaration of Margaret Haynes ("Haynes Decl.") at 9-10. Sellers was injured while under the care of one of Gaudet & Co.'s employees, Shantonia Ross, and ultimately died of those injuries. *Id.* at 9. Sellers's survivors and his estate later filed a wrongful death action against the Gaudet & Co., Right at Home, and Ross in the Circuit court of Mobile County, Alabama.[1] *See id.* at 9.

There is no dispute that the defendants failed to include Right at Home as a named insured in liability policies as required under the Franchise Agreements. Filing No. 39, Tr. I at 11, 22; Filing No. 46, Tr. II at 111-12. Neal Gaudet testified that the failure to

---

[1] In that action, *Kelly Whitlow, as Personal Representative and Administrator of the Estate of Emmett Sellers, Deceased v. Right at Home, LLC, et al.*, No. 02 CV-2019-900248 (Ala. Cir. Ct.), the plaintiffs have settled their claims against Right at Home and Gaudet & Co., but a cross claim for indemnification remains pending. Filing No. 39, Tr. I at 10-11; *see* Filing No. 22-3, Second Amended Complaint; Filing No. 22-4, cross-claim. Also, Gaudet & Co. has moved to dismiss the indemnification action and has filed counterclaims against Right at Home. Filing No. 22-5, motion to dismiss; 22-6, counterclaim. The pending state court action is the basis for the defendants' motion to dismiss or stay this action, arguing abstention under Colo. River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976). *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976). Also, Neal and Alyssa Gaudet have moved to intervene in the action, Right at Home opposes that motion and has moved to dismiss Gaudet & Co's counterclaims. Filing No. 48-1 to 48-3, Exs. 1-3.

5

include Right at Home was unknowing and inadvertent but acknowledged that Right at Home was not insured under the policies. Filing No. 46, Tr. II at 112.

Also, Right at Home learned in discovery about the defendants' background- check practices, and later received an anonymous email from a whistleblower, a former Gaudet & Co. employee, stating that the defendants did not perform pre-employment background checks. Filing No. 35-1, Haynes Decl. 9-10; Filing No. 35-13, Declaration of Brian Petranick ("Petranick Decl.") at 1-2; Filing No. 35-14, Petranick Decl., Ex. B-1. Neal Gaudet maintains that Gaudet & Co. performed pre-employment background checks on every candidate for employment. Filing No. 31, Ex. A, Affidavit of Neal Gaudet at 3; Filing No. 46, Tr. II at 47-50. He testified that he had obtained a preemployment background check on employee Shantonia Ross. Filing No. 46, Tr. II at 55, 57-59.

In August 2020, Right at Home also learned from a whistleblower's anonymous email that the defendants had been providing care to Sellers "off the books" and had not accurately recorded its billings on the Clear Choice accounting and billing software provided to the franchisees, nor had it paid royalties to Right at Home for that care. Filing No. 35-1, Haynes Decl. at 9-10; Filing No. 39, Tr. I at 74. The whistleblower referred to "under the table" payments and provided specific detail about how the "off the books" care was concealed and where Right at Home should look for evidence within the defendants' business records. Filing No. 35-14, Petranick Decl., Ex. B-1, whistleblower email at 4; Filing No. 39, Tr. I at 74-76. The defendants had concealed the revenue by creating handwritten invoices for some of the care provided to Sellers that were paid thought separate checks made out to Gaudet & Co., rather than Right at Home. Filing No. 35-14, Petranick Decl., Ex. B-1, whistleblower email at 4.

6

Right at Home obtained copies of the handwritten invoices and checks in discovery in the state court action. Filing No. 39, Tr. I at 83; Hr'g Exs. C-14 to C-18. From those records and Right at Home's records, schedules, and invoices, Margaret Haynes created spreadsheets pulling the data together. Filing No. 39, Tr. I at 84-89; *see e.g.*, Filing No. 35-16, Ex. C-13, invoice reconciliation; Filing No. 35-7, Ex. A-6, schedule reconstruct; Filing No. 35-23, Ex. C-20, August 1, 2018, schedule reconstruct. Right at Home's investigation and review showed that the defendants had scheduled multiple employees who provided companion care to Sellers on overnight and weekend shifts, but did not record any billable time in the ClearCare system by using a generic name instead of billing through the client's account. Filing No. 35-1, Haynes Decl. at 12; *id.*, Ex. A-6, Schedule Reconstruct; Filing No. 39, Tr. I at 76-79; Filing No. 35-21, Ex. C-18, carelogs. Based on her review, Margaret Haynes concluded that Gaudet & Co. had underreported its revenue and had breached the Franchise Agreements. *Id.* at 91. She stated that "more work ran off the books than there was within the ClearCare system." *Id.*

On November 3, 2020, Right at Home notified the defendants of the termination of the Franchise Agreements for rendering off-books services, failing to pay royalties, submitting numerous inaccurate reports, misusing confidential information in diverting business, and unauthorized transfer of care. Filing No. 35-1, Declaration of Margaret Haynes ("Haynes Decl.") at 14-15; Filing Nos 35-8, Haynes Decl., Ex. A-7, notice of default; the notice of termination included a list of post-termination obligations. Filing No. 35-9, Haynes Decl., Ex. A-8, notice of termination at 4-7.

Neal Gaudet admits that starting in April 2018, Gaudet & Company billed some of the care provided to a client on handwritten invoices. Filing No. 46, Tr. II at 75. The

money collected on those invoices went into the Gaudet & Co. bank account. *Id.* There is no dispute that the Gaudets paid no royalties to Right at Home on the revenue recorded on the handwritten invoices. *Id.* at 88. Gaudet testified that he provided off the books care to Sellers without paying royalties to Right at Home because the client, "couldn't afford anything more than a certain amount" and had asked Gaudet to "see if [he] could do it totally without any company, just us personally, which [he] declined and said it had to go through at least Gaudet & Company." *Id.* at 70. He did so because if he "didn't do anything, this poor man was going to be out on the street." *Id.* at 71.

He continued to log, bill, and pay royalties for care provided on the daytime shift through the client's account on the ClearCare system, but logged the remainder of the 24-hour care provided to Sellers at a discounted rate under the miscellaneous category in the Clear Care System. *Id.* He stated that it was permissible to schedule and log time for administration, orientation, supervision, and training under the miscellaneous category, without paying royalties on that time. *Id.* at 70-74. He acknowledged that the employees listed on handwritten invoices were caregivers, not administrators. *Id.* at 117-18. Further, he testified that Right at Home does not set rates for care and admitted that he could have set a lower rate for Sellers's care and paid royalties on that rate. *Id.* 119.

He also testified that, after receiving the notice of termination of the franchise, he did not take steps to shut down the franchise business, but took steps to start a new home-care business. *Id.* at 121. He does not dispute that he intended to operate independently from the Right at Home brand. *Id.* After the termination of the Franchise Agreements, Gaudet & Co. closed its office in Baldwin County, but continue to operate a home-care business in Mobile under the name "Gulf Coast Care" in the same location,

8

serving the same clients under the same contracts, with the same referrals, and the same phone number as their former Right at Home franchised business. *Id.* at 12, 121-124.

Neal Gaudet testified that Gulf Coast Care is not utilizing Right at Home's brand name or trademarks. *Id.* at 80-82. Right at Home did not provide any evidence to the contrary, but presented evidence of one instance of confusion—a secret shopper reported that an unnamed director of a senior living community told her that Right at Home had an office on campus and was available to provide additional non-medical care to its residents. Filing No. 39, Tr. I at 54.

Right at Home has a franchisee in Mississippi immediately adjacent to the defendants' former territory and a corporate location in Florida immediately to the East. Filing No. 39, Tr. I at 100. Margaret Haynes testified that it would be difficult for Right at Home to refranchise the area while a former franchisee continues to operate using the same system. *Id.* Right at Home "would have to identify that there was a former owner [of the franchise]; and then when questioned about the former owner, we'd have to identify that the owner flipped the sign." *Id.* She stated that it was unlikely that a potential franchisee "would want to come into a territory [where] they're competing against somebody that already knows the secret sauce of the Right at Home system and are using that against them." *Id.* at 100-01. Arthur Marquez, the owner of Brookside Senior Living Community, testified that there are other home-care businesses in the Mobile and Baldwin County areas that provide the same or similar services to seniors as Gaudet & Co. provides. Filing No. 39, Tr. I at 28.

Right at Home seeks an order enjoining the defendants from operating a home health-comfort care business in their former franchise territories and ordering the

9

defendants to fulfill post-termination obligations detailed in the agreements at issue. They argue injunctive relief is necessary to protect their confidential and/or proprietary interests, including customer lists, customer data, prospective customer data, financial information, management and marketing plans, business methodology, business models, manuals and forms used in the business, and goodwill.

Defendants oppose the motion arguing that the defendants have an adequate remedy at law and contending the noncompete covenants are unenforceable under Alabama law. They contend that no exception to Alabama's prohibition on restraints of trade applies to the situation presented here.

II. LAW

When evaluating whether to issue a preliminary injunction, a district court should consider four factors: (1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that the movant will succeed on the merits; and (4) the public interest. *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (*en banc*). A preliminary injunction is an extraordinary remedy and the burden of establishing the propriety of an injunction is on the movant. *Roudachevski v. All-Am. Care Ctrs., Inc.*, 648 F.3d 701, 705 (8th Cir. 2011).

Although no single factor is determinative, the failure to demonstrate the threat of irreparable harm is, by itself, a sufficient ground upon which to deny a preliminary injunction. See *Adam-Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299 (8th Cir. 1996); *see also Modern Computer Sys., Inc. v. Modern Banking Sys.*, Inc., 871 F.2d 734, 738 (8th Cir. 1989) (en banc); *Roudachevski*, 748 F.3d at 706. Even when a plaintiff has

10

a strong claim on the merits, preliminary injunctive relief is improper absent a showing of a threat of irreparable harm. *Id.* The threat of irreparable harm requirement is a necessity in proving the propriety of preliminary injunctive relief. *Id.* "'Loss of intangible assets such as reputation and goodwill can constitute irreparable injury.'" *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) (quoting *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)) (noting also that "consumer confusion erodes consumer confidence" in a franchise network and "the closure of one franchise may make customers wonder whether other [of the plaintiff's] franchises will continue to operate in the future."). "Harm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." *Id.*

Though it is not sufficient on its own, the likelihood of success on the merits has been referred to as the most important of the *Dataphase* factors. See *Jet Midwest Int'l Co. v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1044 (8th Cir. 2020); *Roudachevski,* 648 F.3d at 705-06. The movant need not prove a greater than fifty percent likelihood that it will prevail on the merits, it "must simply show a 'fair chance of prevailing.'" *Jet Midwest,* 953 F.3d at 1045 (quoting *Planned Parenthood Minn., N.D., S.D. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (*en banc*); *see also Dataphase Sys.*, 640 F.2d at 113.

A showing of irreparable harm does not automatically mandate a ruling in the plaintiff's favor; the court must proceed to balance the harm to the defendant in granting the injunction. *Hill v. Xyquad, Inc.*, 939 F.2d 627, 630-31 (8th Cir. 1991). The Eighth Circuit has repeatedly acknowledged that the public interest favors protecting the freedom to contract by ensuring enforcement of contractual rights and obligations. *See, e.g., PCTV Gold, Inc. v. SpeedNet, LLC*, 508 F.3d 1137, 1145 (8th Cir. 2007). Also, generally, a defendant against whom the plaintiff has made a strong showing of a substantial likelihood

11

of success on the merits cannot complain if the harm it might suffer is due to its own acts in violation of a contract agreement. *DJR Assocs., LLC v. Hammonds*, 241 F. Supp. 3d 1208, 1231 (N.D. Ala. 2017).

Alabama law, by statute, provides that "[e]very contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind *otherwise than is provided by this section* is to that extent void." Ala. Code § 8-1-190(a) (emphasis added).² Alabama Code § 8-1-190 became effective on January 1, 2016.³ *Id.* That statute repealed Alabama Code 1975, § 8-1-1, and codified the common-law exceptions to the general prohibition on restraints on trade, including removing the prohibition on

---

² As relevant herein, the statute sets forth in subsection (b) the contracts that are "allowed to preserve a protectable interest":

> (3) One who sells the good will of a business may agree with the buyer to refrain from carrying on or engaging in a similar business and from soliciting customers of such business within a specified geographic area so long as the buyer, or any entity deriving title to the good will from that business, carries on a like business therein, subject to reasonable time and place restraints. Restraints of one year or less are presumed to be reasonable.
>
> (4) An agent, servant, or employee of a commercial entity may agree with such entity to refrain from carrying on or engaging in a similar business within a specified geographic area so long as the commercial entity carries on a like business therein, subject to reasonable restraints of time and place. Restraints of two years or less are presumed to be reasonable.
>
> (5) An agent, servant, or employee of a commercial entity may agree with such entity to refrain from soliciting current customers, so long as the commercial entity carries on a like business, subject to reasonable time restraints. Restraints of 18 months or for as long as post-separation consideration is paid for such agreement, whichever is greater, are presumed to be reasonable.
>
> (6) Upon or in anticipation of a dissolution of a commercial entity, partners, owners, or members, or any combination thereof, may agree that none of them will carry on a similar commercial activity in the geographic area where the commercial activity has been transacted.

Ala. Code § 8-1-190(B)(3)-(6).

³ The new statute applies to actions filed after its effective date, even if the contract at issue was written and entered into prior to January 1, 2016. *See* Ala. Code § 8-1-197.

12

partial restraints. See Ala. Code § 8-1-190, comment ("Because other 'partial restraints' have been recognized by the courts as not inconsistent with the general prohibition, this redraft codifies those exceptions."); Ala. Code § 8-1-197, comment ("This section is intended to codify current Alabama case law.")

Alabama law has long distinguished between total restraints and partial restraints and "[n]on-compete agreements which impose only a partial restraint on trade have long been enforceable under Alabama law." *Akzo Nobel Coatings, Inc. v. Color & Equip. LLC*, 451 Fed. App'x 823, 824 (11th Cir. 2011). Under Alabama law, "a restraint is partial, and not total, if the restrained party can engage 'as a practical matter, in a meaningful pursuit of one's calling, notwithstanding the terms of the agreement.'" *Id.* at 824-25 (quoting *Ex parte Howell Eng'g & Surveying, Inc.*, 981 So.2d 413, 423 n. 4 (Ala. 2006)). A partial restraint can be upheld if it is "properly restricted as to territory, time and persons" and supported by sufficient consideration. *Id.* (quoting *Gafnea v. Pasquale Food Co.*, 454 So. 2d 1366, 1368 (Ala. 1984)). Alabama courts have enforced covenants in the franchise context. *See, e.g., Gafnea,* 454 So. 2d at 1369; *Sylvan Learning Inc. v. Learning Sols., Inc.*, 795 F. Supp. 2d 1284, 1294 (S.D. Ala. 2011); *Sylvan Learning, Inc. v. Gulf Coast Educ., Inc.*, No. 1:10-CV-450-WKW [WO], 2010 WL 3943643, at *2-3 (M.D. Ala. Oct. 6, 2010).

Alabama's recently enacted restrictive covenant statute "makes explicit" the limitations to partial restraints that "have developed over time." Ala. Code § 8-1-190, comment. The first is the requirement in that all exceptions must preserve a protectable interest as defined in Section 8-1-191, and the second is that restraints in contracts in connection with sale of goodwill and in agreements between commercial entities and their

13

agents, servants, or employees to refrain from carrying on or engaging in a similar business within a specified geographic area must be reasonable in time and place. *Id.* "Commercial relationships or contacts with specific prospective or existing customers, patients, vendors, or clients" are protectable interests. Ala. Code § 8-1-191(a)(3). Also "[c]ustomer, patient, vendor, or client good will associated with" an ongoing franchise is a protectable interest. Ala. Code § 8-1-191(a)(4)(a). "Restrictive covenants related to good will in franchise or other agreements that otherwise satisfy the requirements of this act are enforceable." Ala. Code § 8-1-191, comment. The Alabama restrictive covenant trade statute "expresses fundamental public policies of the State of Alabama" and governs and applies over any otherwise applicable foreign laws. Ala Code § 8-1-197. Also, under the new law, remedies include an injunction and other appropriate equitable relief. Ala. Code § 8-1-195(a).

III. DISCUSSION

The Court first finds that Alabama law applies to the noncompete and confidentiality agreements at issue. Enforcement of Alabama restrictive covenants law is clearly a public policy of the State of Alabama.

The Court next rejects the defendants' argument that the noncompete agreements at issue are void under Alabama law because they cannot fit within the stated exception to the prohibition of restraints of trade provided in § 8-1-190(b)(4) since Right at Home presently does not "carr[y] on a like business" in the specified geographic area. By its terms, that subsection of the statute is inapplicable herein. This action does not involve an agreement between an "agent, servant, or employee of a commercial entity" and "such entity." Ala. Code § 8-1-191(b)(4).

14

The defendants are not employees of Right at Home. The provisions of the statute that allow restraints conditioned on "carry[ing] on a like business" within a certain area involve either buyer/seller or employer/employee relationships, not arrangements or restrictions between commercial entities such as a franchisor and franchisee. Ala. Code § 8-1-190 (b)(3) (sale of goodwill); (b)(4) (employer/employee and conducting business); (b)(5) employer/employee and solicitation). The focus of those provisions is preventing a competitor from getting an unfair competitive advantage by exploiting a protectable interest. In their capacities as franchisor and franchisee, the parties are not competitors. The business that a franchisor is "carrying on" is distributing franchises, not engaging in the underlying commercial activity that is the subject of its franchise.[4]

To require a franchisor to carry on a like business in the area before enforcing a valid noncompete clause would effectively nullify most noncompete provisions in Franchise Agreements. The customers, patients, vendors, and client goodwill associated with a franchise are expressly protected interests under the statute. Ala. Code § 8-1-191(a)(2). It makes no sense to protect those franchise interests while at the same time creating an impediment to enforcement of the valid agreements that are the vehicles for doing so. A former franchisee's continued rogue operation and presence in a relevant territory effectively precludes the franchisor from establishing a competing franchise there.

As noted, the amended statute codifies the common law with respect to partial restraints of trade. Under the common law, and as expressed in the commentary to the

---

[4] Viewed in this light, the present situation may more likely fall under the subsection of the statute that provides "[u]pon or in anticipation of a dissolution of a commercial entity, partners, owners, or members, or any combination thereof, may agree that none of them will carry on a similar commercial activity in the geographic area where the commercial activity has been transacted." Ala. Code § 8-1-190(b)(6).

15

statute, restrictive covenants related to franchise agreements that are reasonable in terms of duration and geographic area are enforceable under Alabama law. The defendants' argument to the contrary is without merit.

The Court finds the plaintiff has sustained its burden to show it is entitled to injunctive relief. Right at Home has shown it has no adequate remedy at law and will suffer irreparable injury absent an injunction. An award of money damages for breach of contract will not compensate Right at Home for the damage to its reputation and loss of goodwill caused by the defendants' conduct.[5] Damages to reputation and goodwill are not quantifiable. Right at Home has shown an injury to its protectible franchise interest that defies calculation. Right at Home has shown that it will have difficulty recruiting another franchisee for the territory as long as the former franchisee operates a business in violation of the noncompete clause using the training, practices, and policies developed and provided by Right at Home. Also, Right at Home will suffer injury to its business reputation and its ability to manage franchises if it is perceived as tolerating the defendant's conduct.

Right at Home has also shown more than a fair probability of success on the merits of both its breach of contract claim and its breach of a restrictive covenant claim. Notably, the defendants have not challenged the agreements at issue on the merits—have not raised any defenses such as unconscionability, fraud in inducement, or failure of consideration. The Franchise Agreements were negotiated by knowledgeable and competent businesspeople and the defendants represented that an attorney had reviewed the documents. The restrictive covenant at issue here is the sort or partial

---

[5] Also, the agreements at issue provide that actions for money damages are to be resolved in arbitration. The plaintiff seeks only equitable relief in this Court.

16

restraint of trade that is permitted under Alabama law as long as it is reasonable in terms of time and geographic area. Restrictions of between one and two years in length are presumed reasonable under various provisions of Alabama's restraint of trade statute. A geographical area limited to ten miles outside the defendants' former franchise territory is not unreasonable.

The defendants admittedly breached two provisions of the Franchise Agreements. They admit that they failed to obtain liability insurance that covered Right at Home, as required under the contract, although unwittingly. They candidly concede that the failure to obtain the insurance is a breach of the contract. More importantly, the defendants admittedly kept a separate accounting of time for services and companion care that was covered under the contract and in so doing, filed to make royalty payments to Right at Home that were required under the contract. Because either of these actions is sufficient to constitute a breach, the Court need not resolve the disputed issues of fact concerning the background checks issue. It appears that there is a fair probability that Right at Home was justified in terminating Gaudet & Co.'s franchise.

Next, the Court finds the balance of harms weighs in favor of Right at Home. Right at Home has shown that it will be difficult to find a new franchisee for the territories with the Gaudets operating as a competitor in the franchise territories using Right at Home's system, training, operations, contracts, and forms. They have also demonstrated harm to their reputation and goodwill caused by the defendants breach. Clearly, the harm to the Gaudets is the forced termination of operations, which is significant. However, the defendants' predicament is largely of their own making. They admittedly breached the Franchise Agreements in a scheme to provide off-the-books care and underreport

17

revenue and elected to continue a home health/companion care business after its franchise was terminated, opting to re-brand the business under a different name. They have not argued that they misunderstood or failed to comprehend the consequences of that decision. The defendants admitted to a serious breach of the Franchise Agreements, acknowledging that they essentially took money under the table that should have gone to Right at Home. Neal Gaudet's professed altruistic purpose in providing care to a client who could not afford the rates for care established by Right at Home does not excuse that breach.

Though the Gulf Coast Care business is presently his livelihood, Neal Gaudet has a work history that includes experience in hospital administration and it is likely that he can obtain other employment in the healthcare sector. Also, the defendants are free to establish a home companion care business outside the restricted area, and can set up such a business within the restricted area after eighteen months. In considering the harm to third parties, the Court finds that Gaudet & Co.'s clients may be inconvenienced, but there are other avenues of in-home or companion care available to them. The Court can mitigate the harm to the patients by providing a reasonable period of time for the defendants to wind up their business to allow the clients to obtain home- care services from another provider. The Court finds the balance of harms weighs in favor of Right at Home.

Because the defendants have not alleged or shown that the Franchise Agreements or covenants are not enforceable, the public interest in protecting the right to contract will be served by the injunction. Also, for the Court to allow a business to engage in conduct

that does not conform to business ethics without consequence would not serve the public interest.

Accordingly, applying the *Dataphase* factors, the Court concludes that an injunction should issue. The Court will endeavor, through its equitable powers, to provide for a seamless transition by imposing a transition period with a firm deadline and by requiring the defendants to comply with the transition checklist Right at Home provided to the defendants with its notice of termination. Accordingly,

IT IS ORDERED:

1. The plaintiff's motion for a preliminary injunction (Filing No. 19) is granted.
2. A separate preliminary injunction will be entered.

Dated this 29th day of January, 2021.

BY THE COURT:

s/ Joseph F. Bataillon
Senior United States District Judge